1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                      SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| SAMUEL WEBSTER,<br><br>                                   Petitioner,<br><br>v.<br><br>DANIEL PARAMO, et al.,<br><br>                                   Respondents. | Case No.:  14-CV-994 DMS (NLS)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING THE FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS**<br><br>(Dkt. No. 22) |

        Before the Court is Petitioner Samuel Webster's ("Webster") First Amended
Petition ("Petition") for a Writ of Habeas Corpus under 28 U.S.C. Section 2254.  (Dkt.
No. 22.)  He asserts claims of instructional error, improper juror excusal, and ineffective
assistance of trial and appellate counsel.  Respondent Daniel Paramo, Warden
("Respondent") filed an answer to the Petition, and Webster filed a traverse.  (Dkt. Nos.
25 and 31.)  The Court has reviewed the filings and lodgments submitted in this matter.
For the following reasons, the Court **RECOMMENDS** the Petition be **DENIED.**

1

## I.   FACTUAL SUMMARY[1]

2

### a.  The People's Case

3

On December 10, 2009, at around noon, Janet McNeely and her boyfriend Devin

4 Johnson went to Maddox Liquor Store, which was located at the corner of Fairmount

5 Avenue and Thorn Street in the City Heights area of San Diego. McNeely went into the

6 store to get change for the bus. When she came out, she and Johnson walked across the

7 street to the bus stop. McNeely testified that a Black man, wearing dark clothing and a

8 baseball cap, came out of the store and stared at them. Johnson stared back at him. The

9 man angrily yelled, "What?" Johnson took his gloves from his back pocket, shook them

10 over his shoulder toward the man, and said, "Do I know you?" to McNeely, as though

11 asking himself that question. McNeely asked Johnson whether he knew the man, and

12 Johnson replied he did not. Johnson put the gloves back in his rear pocket when McNeely

13 asked him to do so. McNeely testified that the man got into a "grayish" car with tinted

14 windows that drove away eastbound on Thorn Street.

15

Shortly thereafter, Brady Manning and his wife Marlene Barrales were in their car

16 on Thorn Street, waiting to turn onto Fairmount Avenue, when the gray car, which

17 Manning thought was a silver 1999 Honda Accord, pulled up near them. A Black female

18 was driving the car, and the passenger was a Black male. Manning indicated he saw the

19 passenger reach his arm outside the silver Honda, point a black semiautomatic handgun at

20 Johnson, and fire two shots. Barrales heard the shots. Johnson fell to the ground. The

21 Honda went past Manning and Barrales as it drove away.

22

Van Trieu, a Honda mechanic, testified he was about 200 feet away from the

23

24

_____

25 [1] The Court quotes verbatim the factual background from the California Court of Appeal's opinion.
(Lodg. 6.)  *See* 28 U.S.C.§ 2254(e)(1) ("a determination of a factual issue made by a state court shall be
26 presumed to be correct;" the petitioner has "the burden of rebutting the presumption of correctness by
clear and convincing evidence."); *see e.g., Garvin v. Farmon*, 258 F.3d 951, 952 (9th Cir. 2001)
27 (paraphrasing facts from the state court opinion).

shooting when it happened. He heard two pops, turned around, and saw a silver Honda Accord sedan driving away and the victim lying on the ground. Trieu heard someone say, "I smoked you."

Dr. Craig Nelson, a deputy medical examiner for the County of San Diego performed an autopsy on Johnson and signed Johnson's death certificate. Johnson had been shot once and died as a result. The manner of death was homicide.

Detective John Howard of the San Diego Police Department responded to the scene at around 2:45 p.m., a couple of hours after the shooting. He found two nine-millimeter shell casings. The gun was never recovered. Detective Howard received information that led him to believe that Webster might be a suspect. Through a computer search, he learned that Rachael Battle was Webster's girlfriend and that she owned a silver Honda similar to the one used in the shooting. Detective Howard contacted Battle at around 9:30 that night. With Battle's consent, Detective Howard interviewed her at police headquarters and Battle detailed Webster's involvement in the murder. Battle told Detective Howard that she picked Webster up near her home earlier that day and later drove him to Maddox Liquor Store, where Webster bought a pint of Hennessy. She indicated that they then drove around the block, ended up at a stoplight on eastbound Thorn Street, she heard a gunshot, Johnson fell to the ground, and Webster put a gun on the floorboard of her car.

Homicide Detective Jana Beard testified that she interviewed Battle at police headquarters a couple of days later. Battle said she was driving her car when the shooting occurred. She said that although she did not see a gun, she believed Webster had a gun in his waistband because of the way he "postured" and "adjusted" himself when he got in her car. She said she believed it was a semiautomatic gun with a black handle that he had carried on prior occasions. Battle also said that Webster was wearing a black T-shirt, a pair of blue jeans, and a black and red ball cap. She related that before he shot Johnson, Webster said, "I'm going to scare him." Battle also told Detective Beard that immediately

after the shooting, Webster said, "Did you see my aim? Did you see my aim?" Battle said that she saw the victim (Johnson) go down, she saw Webster put a gun on the floorboard, she "freaked out," and she "floor[ed] it" as she drove away.

Video surveillance cameras in and around Maddox Liquor recorded both Johnson and Webster inside the store, Battle's car pulling into the parking lot, and the shooting.

Detective Beard interviewed Webster following his arrest. Webster waived his *Miranda*[2] rights and agreed to make a statement. He told Detective Beard that he and Battle went to Maddox Liquor after arguing all morning, and pulled into the parking lot. Webster said he went inside, bought some Hennessey, returned to the car, and they left. Battle drove the wrong way and went back to the store. Webster said he heard the sound of gunfire and thought someone was shooting at their car. He told Detective Beard, "I didn't kill nobody."

Detective Beard advised Webster that the shooting incident was captured on video. Webster replied, "If it is then you have no reason talking to me." Detective Beard told Webster he was going to be booked on a murder charge, and Webster responded that he did not kill anybody and he did not own a gun.

Battle testified under a grant of immunity. She stated that on December 10, 2009, she picked Webster up in her silver 2001 Honda Accord. Webster was wearing a dark shirt, jeans, and a hat. He told Battle he wanted to go to a liquor store. When Webster got into the car, Battle thought he might have a gun because of the way he maneuvered himself. Battle testified that Webster often carried a black semiautomatic handgun. At Webster's request, they drove to Maddox Liquor. Battle parked in the parking lot, and Webster got out of the car and entered the store. Battle testified that when Webster came back out, he nodded his head toward someone. He was agitated when he got back in the car. Webster explained that he tried to say "hi" to a guy, but the guy did not respond.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

Webster may have said he "had a problem" with that person. Webster directed her to drive and circle around a school back toward Fairmount Avenue. When they got to the red light at Fairmount Avenue, Webster, who was still agitated, said, "I'm just going to scare him." Webster fired two shots at Johnson, who was standing on the corner on Battle's right-hand side. Battle saw Johnson lying on the ground. She also saw Webster put the gun on the floorboard. Webster told her to drive. Battle testified she was frightened and "slammed on the gas," causing the front wheels to come off the ground. Webster asked her, "Did you see my aim?" Later that day, Webster told Battle that she should talk to the police but not say anything about their involvement in the shooting.

### b. The Defense Case

Kristen Beyers, who works in the forensic biology unit of the San Diego Police Department crime laboratory, testified that she analyzed DNA swabs taken from the passenger's and driver's sides of Battle's Honda Accord. Webster and Battle were excluded as possible contributors to the passenger's side samples. Regarding the driver's side sample, Battle was excluded and the results were inconclusive as to Webster.

The parties stipulated that the Honda Accord was processed for gunshot residue, and no particles of gunshot residue were found.

## II.   PROCEDURAL BACKGROUND

### a. The Trial

On January 14, 2011, a jury convicted Webster of second degree murder under California Penal Code Section 187(a), and found true the fire-arm use allegation under California Penal Code Section 12022.53(b). (Lodg.1 at 120, 200.) The trial court found true the no-bail and prior conviction allegations in a bifurcated proceeding. (Id. at 206-207.) Webster was sentenced to a total of 47 years to life in state prison. (Id. at 156-57, 207-209.)

### b. The Direct Appeal and Habeas Petitions

Webster filed a petition for writ of habeas corpus to the California Court of

Appeal.  (Lodg. 3 (Case No. D060193).)  He also filed a direct appeal that raised claims similar to those raised in his federal petition.  (Lodg. 4 (Case No. D059430).)

On November 30, 2012, the California Court of Appeal consolidated the habeas petition and the appeal.  (Lodg. 6.)  The court denied the habeas petition and affirmed Webster's conviction.  (Id.)

Webster then petitioned the California Supreme Court for review.  (Lodg. 7 (Case No. S207927).)  On February 13, 2013, the California Supreme Court denied without prejudice the petition as to any relief Webster might be entitled to after it decided *People v. Bryant*, 56 Cal. 4th 959 (2013), which was pending before the court at that time. (Lodg. 8.)

On April 14, 2014, Webster constructively filed his federal petition before this Court.  (Dkt. No. 1.)  The Court granted Webster's request to stay the proceedings so that he could exhaust two additional claims.  (Dkt. No.15.)  Webster filed a habeas petition before the California Supreme Court as to claims for ineffective assistance of trial and appellate counsel.  (Lodg. 9.)  On February 25, 2015, the California Supreme Court denied the petition without comment.  (Lodg. 10.)  On May 6, 2015, Webster filed his First Amended Petition.  (Dkt. No. 22.)

## III.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Petition.  Under the AEDPA, a federal court will not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the decision was (1) contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002). That standard under AEDPA is difficult to meet and "demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotations omitted).  A federal habeas petition must allege a deprivation of one

6

or more federal rights; the federal court will not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

A federal habeas court may grant relief where the state court decides a case "contrary to" federal law by applying a rule different from the governing law set forth in Supreme Court cases or decides a case differently than the Supreme Court on a set of indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).  A federal court may also grant habeas relief where a state court decision is an "unreasonable application" of clearly established federal law, such as where the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies those decisions to the facts at issue. *Id*. at 407.

The state court decision must be more than incorrect; to warrant habeas relief the state court's application of "clearly established federal law" must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "Objectively unreasonable" differs from "clear error" in that a federal court cannot grant relief only because it believes the state court erroneously applied "clearly established federal law;" rather, the application must be objectively unreasonable. *Id*. at 75-76 (internal citation omitted).

If a state supreme court silently denies a petitioner's appeal with a summary dismissal, the reviewing federal habeas court must review the last reasoned state court opinion in making a decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 806 (1991).  Where the state courts supply no reasoned decision on the claims presented for review, this Court must perform an "'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## IV.    DISCUSSION

### a.  Instructional Error Claim (Grounds One and Two)

In interrelated claims, Webster contends the trial court erred by failing to *sua sponte* instruct the jury on lesser included offenses of voluntary and involuntary

7

manslaughter (Ground One), and that the trial court's error was not harmless (Ground Two).  (Dkt. No. 22 at 26-39, 40-45.)  He contends these errors violated his Fourteenth Amendment right to due process and to present a defense, and his Sixth Amendment right to have the jury determine substantial issues material to his guilt.  (Id. at 44-45.)

Webster raised these similar claims in his direct appeal.  (Lodg. 4.)  The state appellate court found the instructional error was harmless.  (Lodg. 6 at 24.)  Webster then filed a petition for review in the California Supreme Court, which was exhausted and summarily denied without prejudice to any relief he might be entitled to after that court decided *People v. Bryant,* 56 Cal. 4th 959 (2013), which was pending before the court at that time.  (Lodgs. 7 and 8.)

The California appellate court set forth the circumstances surrounding the instructions as follows:

> During the jury instruction conference, the court said, "I don't see there's been any evidence presented to support any theory of voluntary or involuntary [manslaughter], unless you want to point me to something."  Defense counsel replied, "Not at this time." Seeking clarification, the court asked Webster's counsel, "So you are not requesting an [lesser included offense] of either [voluntary or involuntary] manslaughter; correct?" Defense counsel responded, "Correct."
>
> With respect to the murder charge, the court instructed the jury under a modified version of CALCRIM No. 521 that, if the jury decided Webster had committed murder, it was required to decide whether the murder was of the first or second degree; and that it could convict him of first degree murder under any one of three theories: (1) the murder was willful, deliberate, and premeditated; (2) the murder was committed by lying in wait; or (3) the murder was committed by shooting a firearm from a motor vehicle. The court also instructed the jury on second degree murder, but did not instruct on the lesser included offenses of voluntary manslaughter or involuntary manslaughter.

(Lodg. 6 at 19-20.)

The California appellate court then analyzed the claim as follows:

> Webster specifically contends the court committed reversible error in failing

to instruct the jury sua sponte on voluntary manslaughter premised on the theory that he committed an unintentional killing without malice during the course of an inherently dangerous assaultive felony. [FN 5] The Attorney General disputes that *Garcia* articulated a new theory of voluntary manslaughter. With respect to involuntary manslaughter, Webster contends the court committed reversible error in failing to instruct the jury, *sua sponte*, on involuntary manslaughter premised on the theory that he committed an unintentional killing without malice during the course of the misdemeanor offense of brandishing a firearm.

[FN 5] The Supreme Court has granted review on this issue in *People v. Bryant* (2011) 198 Cal.App.4th 134, review granted November 16, 2011, S196365. In *Bryant*, this court followed the *Garcia* court's conclusion that voluntary manslaughter may consist of an unlawful killing during the commission of an inherently dangerous felony, even if unintentional.

In support of these contentions, Webster states "[t]here was evidence from which the jury could have reasonably concluded that [he] fired the gun without malice ... by accident or only with the intent to frighten [the victim, Johnson]." Specifically, he asserts "the only evidence bearing directly on [his] intent was his statement to Battle immediately before the shooting that he intended merely to 'scare' Johnson," and "that statement was substantial evidence that he did not intend to inflict bodily injury." Thus, Webster contends, "[if] the jury concluded that [he] merely intended to commit the misdemeanor of brandishing the firearm, then it would have been warranted in returning a verdict of involuntary manslaughter. If, on the other hand, the jury concluded that [he] intended to commit a felony by firing the gun, it would have been warranted in returning a verdict of voluntary manslaughter."

We conclude Webster's contentions are unavailing. "The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 (*Blair*).) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (Id. at p. 745.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Ibid.; see also People v. Breverman* (1998) 19 Cal.4th 142,

162 (*Breverman*).) "'In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.'" (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

Here, we shall assume, without deciding, that it was error for the court to fail *sua sponte* to instruct the jury on the lesser included offenses of voluntary manslaughter and involuntary manslaughter. The People urge us to conclude that any such error was harmless under the *Watson* test for prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836), which the California Supreme Court in *Breverman, supra*, 19 Cal.4th at pages 177-178 made applicable to instructional errors of this sort in noncapital cases. (*See Moye, supra*, 47 Cal.4th at p. 555.)

Under the *Watson* test, an error in failing *sua sponte* to instruct on a lesser included offense requires reversal of the conviction for the greater offense "if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Breverman, supra*, 19 Cal.4th at p. 178.) Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 918 (*Ghilotti*).) *Breverman* explained that appellate review under *Watson* "focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177.)

Here, Webster has failed to meet his burden of showing a reasonable probability under *Watson* that he would have obtained a more favorable outcome had the court *sua sponte* instructed the jury on voluntary manslaughter and involuntary manslaughter. Stating that the "only evidence bearing directly on [his] intent" was his statement to Battle immediately before he fired the handgun that he was only going to scare Johnson, Webster asserts in conclusory fashion that "[t]here was certainly more than 'an abstract possibility' that the jury would have returned convictions on only one of the lesser offenses had it been given the option to do so." However, Webster disregards substantial evidence in the trial record when he claims the only

1
2
3
4
5
6
7
8
9
10
11
12
13
14

evidence bearing directly on his intent was the evidence of his statement to Battle that he was only going to scare Johnson. Homicide Detective Jana Beard testified that when she interviewed Battle at police headquarters after the shooting, Battle stated that Webster asked her (Battle) immediately after the shooting, "Did you see my aim? Did you see my aim?". Battle testified at trial that after Webster fired shots at the person (Johnson) standing on the corner of Fairmount and 45th Street, Webster, asked her, "Did you see my aim?". According to Battle, Webster was agitated before the shooting when he got back in the car after buying liquor at Maddox Liquor. Webster had explained to her that he tried to say "hi" to a guy, but the guy did not respond. Battle testified that Webster may have said he had a problem with that person. She also testified that Webster directed her to drive and circle around a school back toward Fairmount Avenue right before the shooting. Another prosecution witness, Van Trieu, testified he was about 200 feet away from the shooting when it happened. He heard two pops, turned around, and saw a silver Honda Accord sedan driving away and the victim lying on the ground. Trieu heard someone say, "I smoked you." In light of the foregoing substantial evidence that Webster has chosen to disregard, we conclude the court's assumed error in failing to instruct on the lesser included offenses of voluntary manslaughter and involuntary manslaughter was harmless.

15

(Lodg. 6 at 20-24.)

16
17
18
19
20
21
22
23

     In his First Amended Petition, Webster contends the jury could have found he shot the victim by accident while brandishing a handgun or while committing an inherently dangerous felony without malice. (Id. at 26.) Webster argues the trial court erred by failing to *sua sponte* instruct on lesser included offenses of voluntary manslaughter and involuntary manslaughter. (Dkt. No. 22 at 27-29.) Webster also contends his constitutional rights were violated by the failure to instruct on the lesser included offenses, and cites cases supporting the proposition that there is a constitutional obligation to instruct on the defense theory of the case.[3] (Dkt. No. 22 at 28-29.)

24

     Respondent contends in its Answer that the failure of state courts to instruct on

25
26
27

------------------------------

[3] The Court only refers to Webster's arguments and positions as stated in his First Amended Petition because his traverse essentially reiterates his petition and does not substantively add to the analysis. (*See* Dkt. No. 31.)

lesser included offenses in non-capital cases, such as this one, does not present a federal constitutional question.  Respondent also contends the California Supreme Court's decision in *People v. Bryant* makes clear that no lesser included offense instructions were required.  Respondent also argues Webster failed to point to evidence supporting either instruction and there is no reasonable basis to assume the jury would have found him guilty of a less serious charge.  (Dkt. No. 25-1 at 16.)

Here, Respondent's contention is correct that a claim the state court failed to *sua sponte* instruct the jury on lesser-included offenses in a non-capital case is not cognizable in a federal habeas proceeding.  *Solis v. Garcia*, 219 F.3d 922, 928-29 (9th Cir. 2000) (failure to instruct on lesser-included offenses did not present a federal constitutional question).  There is no "clearly established law" as determined by the Supreme Court that requires giving a lesser-included offense instruction in a non-capital case.  *See id*, 219 F.3d at 929.  Therefore, the state court decision cannot be said to be contrary to, or an unreasonable application of, federal law as decided by the Supreme Court, nor an unreasonable  application of clearly established federal law to the facts.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'").

The Ninth Circuit has recognized that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent.  *Solis*, 219 F.3d at 929.  Circuit precedent, however, does not constitute clearly established federal law under AEDPA.  *Renico v. Lett*, 559 U.S. 766, 778-79 (2010).  Even if this exception was considered to be clearly established law, to obtain federal habeas relief on these grounds Webster would need to demonstrate both that the jury was precluded from considering a sound theory of the case supported by substantial evidence to warrant the instructions, and that the jury's non-consideration

of that theory had a "substantial and injurious" effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). As explained below, he has not done so.

To the extent Webster argues the lesser-included offense instructions should have been given to support a defense theory of the case that he killed without malice while committing an inherently dangerous assaultive felony, that argument is now foreclosed by the California Supreme Court's decision in *People v. Bryant*, 56 Cal. 4th 959 (2013). In *Bryant*, the defendant was convicted of second degree murder. The Court of Appeal reversed the conviction, concluding that the trial court erred by failing to *sua sponte* instruct the jury on voluntary manslaughter as a lesser included offense of murder on the theory that defendant killed without malice in the commission of an inherently dangerous assaultive felony. *Id.* at 964.

The California Supreme Court reversed, and concluded that a killing without malice during the commission of an inherently dangerous assaultive felony is not voluntary manslaughter. A defendant who killed without malice while committing an inherently dangerous assaultive felony must have committed the killing without an intent to kill or a conscious disregard for life. *Id.* at 970. Such a killing therefore cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. *Id.* Thus, the court ultimately concluded that because killing without malice in the commission of an inherently dangerous assaultive felony is not voluntary manslaughter, the trial court did not err in failing to instruct the jury on voluntary manslaughter. *Id.* In light of the *Bryant* decision, the manslaughter offenses were not consistent with Webster's theory of the case, and therefore the trial court's decision not to give a lesser included offense instruction did not violate Webster's constitutional right or have a substantial and injurious effect in determining the jury's

1    verdict.[4]

2         For these reasons, the trial court's decision not to *sua sponte* instruct on lesser

3    included offenses did not violate Webster's rights.  Webster's claim that at most he could

4    only be guilty of voluntary or involuntary manslaughter is not supported by the evidence.

5    It is therefore not objectively unreasonable for the state appellate court to conclude that

6    Webster has no valid claim based on the omission of a state law voluntary or involuntary

7    manslaughter instruction.  Even assuming Webster could satisfy section 2254(d), habeas

8    relief is unavailable because the failure to instruct on the lesser-included offenses cannot

9    be said to have had a "substantial and injurious effect or influence" on the jury's verdict.

10   *Brecht*, 507 U.S. at 637-38.  This Court, therefore, **RECOMMENDS** that Webster be

11   **DENIED** habeas relief on his claim that the trial court failed to instruct on lesser

12   included offenses and his claim that such instruction was not harmless.

### b.  Improper Juror Excusal Claim (Ground Three)

14        In his First Amended Petition, Webster claims the trial court erred when it

15   discharged Juror 10 and replaced him with an alternate juror.  He contends the Court of

16   Appeal's failure to reverse the trial court judgment on grounds that the trial court failed to

17   conduct an adequate inquiry into whether the juror was property discharged violated his

18   Sixth Amendment right to a unanimous jury verdict and his Fourteenth Amendment right

19   to due process of law.  (Dkt. No. 22 at 47.)

20        Webster raised a similar claim on his direct appeal.  (Lodg. 4.)  The state appellate

21   court found the claim procedurally barred, and that in any event, the trial court did not

---

[4] Webster's argument that the trial court's decision not to give a lesser included offense instruction of involuntary manslaughter likewise is unavailing.  "[W]hen, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life … and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no *sua sponte* duty to instruct on involuntary manslaughter."  *People v. Brothers,* 236 Cal. App. 4th 24, 35 (2015).  There is no substantial evidence in the record to support an involuntary manslaughter jury instruction here.  (*See* Lodg. 6 at 24.)

14-CV-994 DMS (NLS)

abuse its discretion or violate Webster's constitutional rights in discharging the juror. (Lodg. 6 at 14.)  Webster then exhausted this claim in the petition for review filed with the state supreme court.  (Lodgs. 7, 8.)

The California appellate court set forth the legal principles governing a sitting juror's discharge under Penal Code Section 1089.  (Lodg. 6 at 13.)  Section 1089 states in pertinent part: "If at any time… a juror … becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty … the court may order him to be discharged and draw the name of an alternate…."

The appellate court set forth the circumstances regarding Juror 10 as follows:

During deliberations, juror No. 10 sent the court a note that stated: "Can I speak w[ith] you?" The court clerk informed the court she had asked juror No. 10 why he wanted to speak with the court, and the juror told her he was feeling pressured by the other jurors.

The court summoned juror No. 10 into the courtroom and asked him what he wanted to talk to the court about. Juror No. 10 replied, "I feel different about it than the rest of the people. I don't want to be pressured into making the same decision that other people make, so I'd rather just walk away from it, if I could." When the court asked what he meant, juror No. 10 indicated he no longer wanted to serve on the jury.

The court asked the juror whether he had a full opportunity to share his views with the other jurors. Juror No. 10 replied that he had, but said, "[I]t's like I'm talking to myself." He complained that they were "making up stuff." The court asked juror No. 10 whether he would be willing to remain on the jury and keep an open mind if the court directed the whole jury to continue to deliberate and work together. Juror No. 10 responded, "I can try," adding that the jury had taken a vote, one other person felt the way he did, and he could not "make a decision on someone else's life ... just because you feel this way." He told the court he thought jury service "would be easier, but it's not."

The court directed juror No. 10 to wait outside and then asked counsel what they wanted to do. The prosecutor indicated that, from the juror's comments, it appeared he might not be willing to sit in judgment of another person or follow the law, and it was difficult to know without "getting into what the jury

15

is deliberating on, which we obviously can't do." The prosecutor suggested that the court replace juror No. 10 with an alternate juror because he did not want to be on the jury. Defense counsel disagreed, arguing that wanting to serve as a juror was not a requirement. Counsel suggested that the court instruct the jurors to work together and listen to one another.

Following a break, the court told both counsel that juror No. 10's stated desire to walk away from jury service was based on his statement that he was feeling pressured into making the same decision that other jurors were making, and it appeared he was advising the court that the jury might be hung, not requesting to walk away from jury service due to inability to fulfill his duties as a juror. The court stated it was appropriate to reinstruct the jury on its duty to deliberate. After suggesting a specific modified instruction, the court asked for input.

The prosecutor suggested that the court instruct the jury to evaluate only the evidence presented to them in court. Defense counsel agreed. The court indicated it would include this in the supplemental instruction. The court brought the jury back in and gave the following instructions:

"[A]s I explained to you before, it is your duty to deliberate. It is your duty to talk with one another in the jury room. You should try to agree on a verdict if you can. Each of you must decide the case for yourself but only after you have discussed the evidence with all the other jurors. [¶] Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you. [¶] Now, deliberation, what does that mean? Deliberation means careful consideration of all the evidence and discussion about it. It involves expressing your opinions as well as the reasons for them and listening carefully to the views of all of the other jurors. I would encourage each of you to be as specific as possible when explaining why you hold a certain view about the evidence and to give as much time as necessary for everyone to understand and thoroughly evaluate each person's point of view. [¶] No one should feel rushed or pressured in any way during these discussions, but each of you should be open to the views of others before making up your mind. [¶] Remember that your role is to be impartial judges of the facts and not to act as an advocate for one side or the other. Remember also your decision should be based only on the evidence presented in this court."

A couple of hours later, juror No. 10 sent the court another note which stated,

16

"If I feel like I can't come to the same conclusion as everyone else what is the next step?" The court brought the jury into the courtroom, told the jurors that the note suggested the jury was deadlocked, and asked the foreperson, "Is it your opinion the jury is hopelessly deadlocked at this point?" The foreperson replied, "I don't know. I can't say for sure. The person that couldn't come to a decision was saying that he didn't find it in his opinion."

The court told the jury that a verdict required a unanimous decision, and the question was whether there was no possibility that, with further deliberations or instructions, "all 12 jurors will agree." The jury foreperson responded he did not think everyone would agree. The court asked whether there was anything it could do to help, and the foreperson stated he had suggested that the jurors take another day and "let the person in question sleep on it before he makes his final decision." The court asked for the numerical breakdown. The foreperson responded that the last vote was 11 to 1. When the court asked how many votes had been taken, the foreperson replied there had been three votes. The first was 11 to 1, the second was 10 to 2, and the last was 11 to 1. The court again asked whether additional time would help. The foreperson answered, "It could." The court then asked each of the jurors whether the jury was hopelessly deadlocked. Jurors Nos. 1, 2, 4, and 5 felt the jury was deadlocked. The remaining jurors thought they should resume deliberations the following day. Following a discussion with counsel off the record, the court told the jury to return in the morning, at which time the court would give additional instructions.

The next morning, during a recorded chambers conference, the court informed counsel that juror No. 10 had telephoned the clerk and left a message that he was ill, had been in urgent care the previous night, was on medication, and was not coming to the court that morning. The court called juror No. 10 from chambers, put him on the speaker phone, and directed the court reporter to transcribe the conversation. The court asked juror No. 10 for an update on his condition, stating that, although he did not have to give details, the court wanted to find out whether the illness was "relatively shortlived" and he could return the next day, or whether he felt he could not return in a reasonable period of time. Juror No. 10 replied that he did not know how long he would be ill, stating, "I think it's my nerves. I don't know. My stomach, my head [are] all messed up right now." The court asked him how long he was in urgent care the previous night, and he replied he was there until 9:00 p.m., but it took until 11:00 p.m. to get his medications.

The court told the juror it needed to know how he was feeling, because it had to decide whether it would be appropriate to replace him with an alternate juror. Juror No. 10 replied, "I think it would be better to have an alternate take my place. I would hate to hold you guys up." The court responded that it could wait a reasonable period of time and indicated it would be fine to wait a day, but he might need to be replaced with an alternate if "this may be something that will continue for quite a while." Juror No. 10 told the court, "I think it's going to be more than a day" and explained that the doctor in urgent care had told him to follow up with his primary care doctor, but he had not been able to reach his doctor. He added, "I don't see that being anytime soon" and said he had not slept and was tired. The court told him it would call him back and ended the call.

The court then asked counsel for comments. The prosecutor submitted. Defense counsel expressed the belief that juror No. 10 had gone to urgent care and may have been prescribed medication, but indicated the juror was looking for a way to be removed from the jury. The court stated that juror No. 10's responses appeared to be credible and that the juror could not give a commitment to return within a reasonable period of time. The court then found there was no reasonable option other than replacing juror No. 10 with an alternate. The court stated, "Otherwise, I think we're left in a position of simply waiting an indefinite period of time, which is obviously not fair to all of the ... other jurors." The court concluded, "So unless there's any other comment by either counsel, that['s] what I intend to do."

When neither the prosecutor nor defense counsel objected, the cou[r]t replaced juror No. 10 with an alternate.

(Lodg. 6 at 8-12.)

The appellate court then analyzed claim as follows:

Although defense counsel initially expressed the view that juror No. 10 was looking for a way to be removed from the jury, counsel did not object when the court replaced that juror with an alternate, and, thus, failed to preserve the issue for appeal. (*People v. Boyette, supra*, 29 Cal.4th at p. 462 ["Defendant did not object and thus failed to preserve the issue for appeal."]; *People v. Cunningham, supra*, 25 Cal.4th at p. 1029 ["It is apparent that defense counsel not only did not object to the substitution of the juror or move for a mistrial, but sought to have her excused. Therefore, the present claim of error is waived."]; *People v. Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16 ["As a general

1     rule, a defendant may properly raise in this court a point involving a trial
2     court's allegedly improper discharge of a juror only if he made the same point
3     below."], abrogated on other grounds as recognized in *People v. Yeoman*
   (2003) 31 Cal.4th 93, 117.) Were it necessary for this court to reach the merits
4     of Webster's claim, we would conclude the court did not abuse its discretion
5     or violate Webster's constitutional rights as there is substantial evidence
   supporting the court's finding that juror No. 10 was ill and unable to perform
6     the duties of a juror. (*See* § 1089.)

7  (Lodg. 6 at 14.)

8       In his First Amended Petition, Webster contends that the trial court erred in failing

9  to conduct an adequate inquiry before discharging the juror.  (Dkt. No. 22 at 47.)

10  In support, he cites cases that stand for the proposition that a court may not discharge a

11  juror based on the juror's views on the strength of the government's case, because to

12  discharge a juror who indicates he or she may favor one side over the other would be

13  prejudicial.  (Id. at 55, 59-61.)  Although Webster mentions the state appellate court

14  rejected his claim because counsel failed to object, he does not appear to expressly refute

15  the finding of procedural default.  (*See* id. at 47.)  Rather, he contends review should be

16  granted to determine if the trial court erred in not holding an adequate hearing before

17  discharging the juror.  (Id.)

18       Respondent contends in its Answer that this claim should be summarily denied

19  because the Ninth Circuit has found the state procedural rule an adequate and

20  independent bar to federal habeas review.  (Dkt. No. 25-1 at 21.)  Respondent also

21  contends the state court's implied determination that there was no federal constitutional

22  violation was reasonable.  (Id.)

23       The juror substitution procedure outlined in section 1089 of the state penal code

24  protects a defendant's constitutional right to an impartial jury, which is guaranteed by the

25  Sixth Amendment.  *Bell v. Uribe*, 748 F.3d 857, 867-68 (9th Cir. 2013).  Thus, a state

26  court's ruling that a juror was properly removed under section 1089 is an adjudication of

27  his federal claims and is entitled to AEDPA deference.  *See id.* at 864.  A trial court's

1  finding that good cause exists to remove a juror is a factual finding entitled to deference

2  on habeas review.  *Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997).

3        Here, the appellate court's decision to deny the improper juror excusal claim on

4  grounds it was not preserved for appeal was neither contrary to nor an unreasonable

5  application of clearly established federal law, nor was it an unreasonable determination of

6  the facts presented in the state court proceedings.  A federal court normally cannot review

7  a federal claim for post-conviction relief that has already been rejected by a state court on

8  the basis of an independent and adequate state procedural rule.  *Coleman v. Thompson*,

9  501 U.S. 722, 729-30 (1991); *see also Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir.

10  2004) (petitioner's claim procedurally barred where defense counsel did not

11  contemporaneously object).  Additionally, Webster does not demonstrate that federal

12  review of his procedurally barred claim can nonetheless be undertaken.  To obtain federal

13  review of a procedurally defaulted claim, a petitioner needs to demonstrate cause for the

14  default and prejudice arising from the alleged constitutional violation.  *Id., citing*

15  *Wainwright v. Sykes,* 433 U.S. 72, 84 (1977).  Webster does not suggest there was cause

16  for the procedural default or that it would result in a "fundamental miscarriage of

17  justice."  *See Coleman*, 501 U.S. at 748.   Regardless, even if Petitioner's claim was not

18  procedurally defaulted and because the state appellate court also briefly and impliedly

19  addressed the merits, so too does this Court here.

20        To the extent the state appellate court addressed the merits and concluded

21  substantial evidence supported the court's finding that Juror No. 10 was ill and unable to

22  perform the duties of a juror, the decision did not violate Webster's constitutional rights.

23  Petitioner is correct that a trial judge may not dismiss a juror because that juror is a

24  "holdout" who disagrees with his or her follow jurors as to what their verdict should be,

25  and to do so would be a violation of a defendant's constitutional rights.  *See Dkt. No. 22*

26  *at 55, 58-59, citing United States v. Brown,* 823 F.2d 591 (D.C. Cir. 1987).  But where, as

27  here, there were two potential and possibly intertwined reasons for the juror's excusal,

even the trial court's knowledge that the excused juror was the sole holdout for acquittal does not in itself invalidate the decision to excuse the juror. *See Perez v. Marshall,* 119 F.3d at 1427 (dismissal of holdout juror permissible because juror's emotional instability that made her unable continue deliberating provided good cause for her dismissal).  The Ninth Circuit's decision in *Perez v. Marshall*, 119 F.3d at 1423, which addressed a similar situation to this case, is instructive.

In *Perez*, the state trial judge dismissed a lone holdout juror on the grounds that "she was emotionally incapable of continuing to participate in the jury-deliberation process."  *Id.*  The Ninth Circuit held that the trial judge did not violate the defendant's Sixth Amendments rights by excusing the holdout juror under these circumstances, and the trial court's determination that good cause existed to remove the juror was well-supported by the record.  After considering cases in which jurors were properly replaced due to physical or mental health problems, the court recognized that the juror's emotional infirmity as a juror could have been triggered or exacerbated by her disagreement with the other jurors as to Perez's guilt.  Nevertheless, the trial judge properly excused the juror because the juror's emotional instability prevented her from continuing to perform the essential functions of a juror in the same way that a hearing impairment, a mental illness, or a poor physical health condition would have.  *Id.* at 1427.  The Ninth Circuit found "[t]he fact that the trial judge knew that [the juror] was the sole juror holding out for an acquittal when he dismissed her does not invalidate his decision to excuse her from jury service."  The circuit court explained that the trial judge was "forced to act, not because of [the juror's] status as a holdout juror, but because of [the juror's] emotional inability to continue performing the essential function of a juror-deliberation."  *Id.* The court stressed that the trial judge "took great pains to preserve the originally empaneled jury, interviewed the juror at length, offered alternatives to ease the stress of deliberations, and encouraged her to continue deliberating."  *Id.* at 1427-28.

Here, the state court's determination that Juror No. 10 was properly discharged

was not contrary to or an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts.  Like *Perez*, the court first called Juror No. 10 into the courtroom to conduct an inquiry as to whether he was able to participate in deliberations, encouraged him to continue deliberating, and to keep an open mind.  The court also sought input from counsel and provided a supplemental instruction to the jury regarding deliberations.  On the date Juror No. 10 called in sick, the court also conducted further inquiry to attempt to determine if he would be well enough to return to deliberate in a reasonable amount of time, and learned that Juror No. 10 stated he was ill, needed medical attention and was not certain when he would be able to return.  The trial judge found good cause to excuse Juror No. 10, not because of his status as a holdout juror, but because of the juror's health condition.  Accordingly, the state appellate court's conclusion is not unreasonable.  It also is well-supported by the factual record and is a reasonable interpretation of the facts as they were presented in the state court proceeding.  Even assuming Webster could satisfy 28 U.S.C. § 2254(d), there was no constitutional error in excusing Juror No. 10.  The Court therefore **RECOMMENDS** that Webster's claim on this ground be **DENIED.**

### c.  Ineffective Assistance of Trial and Appellate Counsel Claim (Ground Four)

In his First Amended Petition, Webster contends trial counsel provided ineffective assistance because she failed to object to the trial court's decision to discharge Juror No. 10.  (Dkt. No. 22 at 78.)  He further argues trial counsel failed to investigate whether Juror No. 10 actually suffered from a medical condition that would exclude him from further jury deliberation.  (Id. at 81.)  Webster also argues his state court appellate counsel provided ineffective assistance because he failed to raise the argument that trial counsel was ineffective for not objecting to the discharge of Juror No. 10.  He contends appellate counsel knew trial counsel failed to preserve Webster's appellate rights on that issue, and yet did not raise it in his appellate briefs.  (Id. at 89.)

22

1      Respondent contends in its Answer that Webster failed to establish what grounds

2  trial counsel should have objected on, and that such an objection would have been

3  sustained.  (Dkt. No. 25-1 at 23.)  Respondent also contends Webster did not provide any

4  evidence to indicate the discharged juror did not suffer a medical condition that prevented

5  him from further deliberations.  (Id.)  In light of these things, Respondent argues,

6  appellate counsel likewise cannot be faulted for failing to challenge the trial counsel's

7  conduct.  (Id.)

8      Webster presented his ineffective assistance of trial and appellate counsel claims in

9  the habeas petition he filed in the state supreme court.  (Lodg. 9.)  The state supreme

10  court summarily denied the petition without comment.  (Lodg. 10.)

11      Federal habeas courts "review ineffective assistance of counsel claims in the

12  deferential light of *Strickland*."  *Brown v. Ornoski*, 503 F.3d 1006, 1011 (9th Cir. 2007);

13  *see also Harrison v. Richter*, 562 U.S. 86, 105 (2011) ("The standards created by

14  *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem,

15  review is 'doubly' so." (citations omitted)).  Under *Strickland*, to establish ineffective

16  assistance by his trial counsel, Webster must demonstrate both that: (1) counsel's

17  performance was deficient; and (2) the deficient performance prejudiced his defense.

18  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Failure to establish either prong

19  requires that an ineffective assistance claim be denied.  *See id*.  The *Strickland* standard

20  for assessing the performance of counsel applies to both trial and appellate counsel.

21  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

22      To satisfy the deficient performance requirement, "[t]he challenger's burden is to

23  show 'that counsel made errors so serious that counsel was not functioning as the

24  "counsel" guaranteed the defendant by the Sixth Amendment.'"  *Richter*, 562 U.S. at 104,

25  *quoting Strickland*, 466 U.S. at 687.  To demonstrate prejudice, the petitioner must show

26  that "but for counsel's unprofessional errors," there is a reasonable probability "the result

27  of the proceeding would have been different."  *Strickland*, 466 U.S. at 690.  "A

1    reasonable probability is a probability sufficient to undermine confidence in the

2    outcome." *Id.* at 694; *see Richter*, 562 U.S. at 112 ("The likelihood of a different result

3    must be substantial, not just conceivable").  "Because failure to meet either [*Strickland*]

4    prong is fatal to [an IAC] claim, there is no requirement that we 'address both

5    components of the inquiry if the defendant makes an insufficient showing on one.'"

6    *Gonzalez v. Wong*, 667 F.3d 965, 987 (9th Cir. 2011), *quoting Strickland*, 466 U.S. at

7    697.

8         Courts resolving an ineffective assistance of counsel claim do not inquire into what

9    means and strategies defense counsel might have pursued, but rather they assess whether

10   the choices counsel actually made were reasonable.  *Siriprongs v. Calderon*, 133 F.3d

11   732, 736 (9th Cir. 1998), *citing Strickland*, 466 U.S. at 690.  There is a "strong

12   presumption that counsel's conduct falls within the wide range of reasonable professional

13   assistance," and reviewing courts defer to counsel's reasonable tactical decisions.

14   *Strickland*, 466 U.S. at 689.

15        Here, trial counsel's performance was not deficient in electing not to object to the

16   juror's excusal because the record supports the trial court's finding of good cause to

17   excuse the juror due to his illness.  *See supra*, § IV.b.  Similarly, trial counsel's decision

18   not to object did not prejudice Webster's defense because there is no reasonable

19   probability that the result of the proceeding would have been different if trial counsel

20   objected.

21        Webster's argument that his trial counsel was ineffective for not investigating Juror

22   No. 10's claim of illness is also unavailing.  "While a lawyer is under a duty to make

23   reasonable investigations, a lawyer may make a reasonable decision that particular

24   investigations are unnecessary. [] To determine the reasonableness of a decision not to

25   investigate, the court must apply 'a heavy measure of deference to counsel's judgments.'"

26   *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (*citing and quoting Strickland*,

27   466 U.S. at 691).  Here, Webster's counsel was aware of Juror No. 10's representations to

the Court, and on the record, regarding his health condition, and so this Court cannot say Webster's trial counsel's decision not to investigate the juror's health was unreasonable. Indeed, the record indicated counsel was informed that Juror No. 10 stated he was ill, had been in urgent care the previous night, and was on medication and not coming into court. Counsel also was aware the trial court judge asked Juror No. 10 for an update on his stated condition that he was ill, and that he would not be able to return to court for an undeterminable period of time.  (Lodg. 6 at 8-12.)  Webster has not come forward with any evidence indicating an investigation into Juror No. 10's claim of illness would have revealed the juror was not medically incapacitated, and the record does not show that trial counsel acted ineffectively with respect to her decision not to investigate further.  *See Burt v. Titlow,* 571 U.S. ___, 134 S. Ct. 10, 17 (2013) ("[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.") (internal quotations and citations omitted). Consequently, there is also no indication that the appellate counsel's representation fell below an objective standard of reasonableness by failing to include an ineffective assistance of counsel claim in the direct appeal.

In sum, the state supreme court's denial of Webster's ineffective assistance of trial and appellate counsel claims was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, nor an unreasonable determination of the facts.  Accordingly, the Court **RECOMMENDS** Webster's be **DENIED** habeas relief on this claim.

## V.   CONCLUSION

For the foregoing reasons, this Court **RECOMMENDS** that the district court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) denying the First Amended Petition and dismissing it with prejudice.

**IT IS ORDERED:**

(1)  No later than **February 12, 2016**, any party to this action may file written

objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

(2) Any reply to the objections shall be filed with the Court and served on all parties no later than **February 26, 2016**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  January 29, 2016

Hon. Nita L. Stormes
United States Magistrate Judge

26

14-CV-994 DMS (NLS)